KEITH M. KNOWLTON, L.L.C.
9920 S. Rural Road, Suite 108
PMB# 132
Tempe, Arizona 85284-4100
(480) 755-1777
FAX (480) 471-8956
Attorney for Plaintiff
**Keith M. Knowlton - SBN 011565**
keithknowlton@msn.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Antonio Andres Lechuga,<br><br>              Plaintiff,<br><br>vs.<br><br>Maricopa County Sheriff Joe Arpaio;<br>Detention Officer Kevin Holsom and<br>Spouse Holsom, husband and wife,<br><br>              Defendants. | 16-CV-01178-PHX-DJH (JZB)<br><br><br><br>SECOND AMENDED COMPLAINT |

Plaintiff Antonio Andres Lechuga, as and for his Second Amended Complaint against Defendants, alleges as follows:

**JURISDICTIONAL ALLEGATIONS**

1.     Plaintiff Antonio Andres Lechuga ("Lechuga" and/or "Plaintiff") at all times relevant to the complaint resided in Maricopa County, Arizona.

2.     Defendant Sheriff Arpaio is the duly elected Maricopa County Sheriff.  At all relevant times, the Maricopa County Sheriff's Office is run and controlled by Sheriff Arpaio is a non-jural entity.

3.     Defendant Detention Officer Kevin Holsom B2302 ("Holsom"), at all times relevant to this complaint was a Detention Officer for the Maricopa County

1735964.1

Sheriff's Office ("MCSO") and caused events to occur in Maricopa County, Arizona out of which this complaint arose.

4.    Upon information and belief, if married Defendant Holsom acted in such a manner as to benefit the marital community.

5.    Defendant Spouse Holsom's name is unknown at this time and Plaintiff will amend the complaint to include the spouses name upon discovery.

6.    Defendants and each of them caused events to occur in Maricopa County out of which this complaint arose.

7.    Upon information and belief, Sheriff Arpaio is respondiate superior liable for the acts of Defendant Holsom, his employee on all state tort claims.

8.    Pursuant to A.R.S. §12-821.01, a Notice of Claim was timely filed with each defendant and more than ninety (90) days has taken place since filing.

## JURISDICTION AND VENUE

9.    Plaintiff has fully complied with the requirements of A.R.S. §12-821.01 to bring this action against the State of Arizona, the City of Chandler and/or their employees.

10.    This Court has jurisdiction and venue over this matter and the parties.

## JURY DEMAND

11.    A jury trial is requested.

## FACTUAL ALLEGATIONS

12.    Plaintiff incorporates herein by this reference all the preceding numbered paragraphs.

13.    At all relevant times, Lechuga was acting as an informant for Jail Intel at the Maricopa County Sheriff's Office 4th Avenue Jail.

14.    Detention Officer Holsom was aware of this and on December 12 and December 13, 2014, Holsom disclosed this to Mexican Mafia members and

threatened bodily injury to Lechuga for his role as an informant.

15.    On April 24, 2014, Jail Intel obtained information that the Mexican Mafia in the Jail directed its members to "kill" Lechuga.

16.    As a result, Plaintiff was put in protective custody and was not to be in a cell block ("keep away status") with known Mexican Mafia member(s).

17.    The Mexican Mafia by this time had been documented as having killed hundreds of inmates in jails around the country.

18.    The Mexican Mafia has also been documented as having killed family members of inmates as well.

19.    The United States Supreme Court has recognized that in prison, "informing on gang activities can invite one's own death sentence." *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005).

20.    The Supreme Court also noted that "[m]urder of an inmate, a guard, or one of their family members on the outside is a common form of gang discipline and control[.]"*Id.*

21.    On November 26, 2014, Lechuga was placed in the same cell block as Carrizoza, 4F.

22.    Inmate Carrizoza was investigated for and is a suspected Mexican Mafia Member.

23.    It was later determined by MCSO investigators and reported in the Criminal Complaint against Holsom (Probable Cause Statement) that inmate housing location 4F at the time was highly populated with Mexican Mafia associates.

24.    It was like putting a mouse in a room of cats.

25.    On December 12, 2014, Holsom was at Lechuga's cell door delivering evening meal service when he got into a "heated exchange" with Lechuga.

26.    While making threats to Lechuga he "shouted to the entire pod Lechuga is a snitch and a rat."

27.    Lechuga told Jail Intel Officers that on December 12, 2014, just after dinner meal service he and Officer Holsom had a heated exchange of words as Holsom made threatening statements to Lechuga.

28.    Lechuga informed Jail Intel Officers that the threats included shouting to the entire pod Lechuga is a snitch and a rat.

29.    Lechuga later learned from the Criminal Complaint (Probable Cause Statement) that other Detention Officers were present in the area and that these Detention Officers verified to MCSO Officers investigating the matter that they were present and that what was said and done above occurred as Lechuga reported.

30.    None of the Detention Officers present took any action to report, stop, remediate or discipline Officer's Holsom's conduct.

31.    However, when interviewed they verified that they remembered Holsom's conduct with Lechuga.

32.    The exchange between Holsom and Lechuga continued on December 13, 2014.

33.    Holsom was not assigned to Lechuga's cell block that day but he contacted Tower Officer Knight, who was in the Control Tower over Lechuga's cell block and asked if he could help with the meal service.

34.    Knight later stated it was not unusual for Officers not assigned to assist with serving meals and he allowed him to do that.

35.    However what happened next is extremely troubling and is reported in the Criminal Complaint (Probable Cause Statement).

36.    Holsom entered the Control Tower, where officer Knight was located using his jail key and went directly to the intercom and began a heated conversation

4

with Lechuga over the intercom system.

37.    In the immediate presence of Tower Officer Knight, Holsom stated to Lechuga over the intercom that he "would fuck him up."

38.    "Knight said [Holsom] went directly to the intercom and began a heated conversation with inmate Lechuga.  Holsom began to argue with Lechuga stating he would fuck him up."

39.    After the conversation with Lechuga, Holsom, still in the presence of Tower Officer Knight, contacted another inmate named Carrizoza (also referred to in the records as "Carrazoza") and they agreed that Holsom would open Carrizoza's and other inmate's cell doors when Lechuga was out of his cell so that Carrizoza and the other inmates could assault Lechuga.

40.    Holsom further told Carrizoza that he had Plaintiff's personal information and he would provide the information to Carrizoza on the back of a tank order.

41.    Holsom and Carrizoza discussed exactly when the assault would take place.

42.    All this was in the immediate presence of, overheard by and verified after the fact by Tower Officer Knight that it occurred.

43.    Additionally, it was recorded by the electronic systems in the jail.

44.    Again, even though this conduct occurred in his immediate presence Tower Officer Knight failed to intervene, report, stop, remediate, or discipline Officer's Holsom for this outrageous conduct.

45.    However, when Detention Officer Knight was interviewed by MCSO Detectives he then remembered the conduct.

46.    Lechuga heard the conversation between Holsom and Carrizoza over the intercom.

47.    Holsom then opened Lechuga's cell door.

48.   However before other inmates could get to Lechuga, Holsom or some other detention officer closed Lechuga's cell door.

49.   On November 26, 2014, Lechuga reported to Jail Intel that he was being screamed at by inmates as he entered the housing unit that he was a "snitch."

50.   Lechuga did not learn until the Criminal Complaint (Probable Cause Statement) was filed against Holsom on January 15, 2015, that audio recordings from the Jail, on November 26, 2014 captured Holsom discussing with a Mexican Mafia leader and/or members Lechuga's "status" with an inmate known or suspected to be a Mexican Mafia member before Plaintiff was moved into the pod he was in at the 4th Avenue Jail.

51.   Further, from the same Criminal Complaint (Probable Cause Statement), Lechuga learned Holsom instigated the move of Lechuga into the pod where there were Mexican Mafia members so that Lechuga could be identified as a "snitch."

52.   Pursuant to MCSO policy, practice and/or procedure, Detention Officers are allowed on their own authority and at their own discretion and without having to obtain permission from MCSO supervisors, to move inmates from one cell block to another.

53.   Lechuga also learned from the Criminal Complaint (Probable Cause Statement) that Holsom had inappropriately reviewed Lechuga's file at the jail and had Plaintiff's personal and family information.

54.   The Criminal Complaint (Probable Cause Statement) documents that on December 13, 2014, just 30 minutes prior to entering the 4F tower and having the intercom conversations with Lechuga and Carrizoza, a known or suspected Mexican Mafia inmate, Holsom retrieved Lechuga's arrest report which contained Plaintiff's personal information, such as home address and relative information.

55.   The Criminal Complaint (Probable Cause Statement) documented that

6

Holsom had written this information on a note, specifically the address of Lechuga's mother.

56.    Holsom gave Lechuga a handwritten note containing the address of his mother that Holsom had obtained from the file.

57.    Holsom did this at the time Plaintiff filed his initial grievance regarding Holsom's conduct.

58.    Officer Holsom was interviewed on January 13, 2015 by MCSO Detectives.

59.    Holsom admitted to having the discussion with inmates Lechuga and Carrazoza as set forth herein.

60.    Holsom told detectives his actions were unacceptable and was aware Carrazoza was believed to be a member of the Mexican Mafia.

61.    Holsom was forth coming and aware of the dangers of releasing information to Mexican Mafia members stating he knew Lechuga was a keep away from Mexican Mafia members.

62.    Holsom self-admitted he was concerned citing when he exited the tower on December 13th after arranging with Carrazoza to have Lechuga assaulted, Carrazoza took him seriously and Lechuga could have been in significant danger.

63.    Holsom admitted his conduct.

64.    Holsom knew the inappropriateness of his conduct.

65.    Holsom knew it placed Lechuga in significant danger, and all this conduct occurred in the immediate presence of other officers.

66.    Holsom was arrested and is presently being prosecuted for his involvement with the Mexican Mafia.

67.    Holsom is being prosecuted under A.R.S. § 13-2321(A)(1) and (2) for participating in or assisting a criminal street gang.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

68.    Lechuga agreed to be an Informant solely upon MCSO agreeing that his identity would be kept secret.

69.    Holsom, an employee of MCSO, disclosed this information to members of the Mexican mafia in the 4th Avenue Jail which created a danger to Lechuga and his family he would not have otherwise faced.

## COUNT ONE
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

70.    The allegations and circumstances set forth above are fully incorporated herein by this reference.

71.    Defendant Holsom conduct as set forth above, including verbally yelling to all the inmates in Lechuga's pod the Lechuga was a "snitch" and then threatening Lechuga life by allowing other inmates to get to him in his cell and then opening Lechuga's cell door was extreme and outrageous.

72.    Defendant Holsom intended his conduct to cause Lechuga emotional distress and to fear for his life and safety because he acted as an informant for MCSO within the 4th Avenue Jail.

73.    The acts of Holsom put Plaintiff's life at risk in the Maricopa County Jail system.  As a result of the threat to Lechuga's life raised by Holsom's actions, Lechuga was released from Jail.

74.    Defendant Holsom's conduct caused Lechuga sever emotion distress and fear for his life and the life of his family, especially when his cell door was opened after Holsom told him he was going to "fuck him up," told other inmates so Lechuga could hear he was going to open Lechuga's and their cell doors so that they could get to Lechuga and then he opened Lechuga's cell door so that this could take place.

75.    The threat to Lechuga's and his family continues even though Lechuga

8

was released from jail and continues to this day.  Lechuga is living his life looking over his back at all times.

76.    Maricopa County and/or Sheriff Arpaio is respondeat superior liable for the actions of Defendant Holsom.

77.    Defendant Holsom's actions proximately caused Plaintiff damages, including sever emotional distress, in an amount to be proven at trial.

78.    Plaintiff is entitled to punitive damages against Defendant Holsom pursuant to A.R.S. § 12-820.4 to the extent he acted outside the course and scope of her employment.

## COUNT TWO
## NEGLIGENT HIRING, RETENTION AND SUPERVISION

79.    The allegations circumstances set forth above are fully incorporated herein by this reference.

80.    Upon information and belief, Sheriff Arpaio ("Sheriff") was grossly negligent and/or negligent in the hiring and/or training and/or supervision of Defendant Holsom.

81.    Holsom, acting as a detention officer for the Maricopa County Sheriff's Office at the 4th Avenue Jail committed torts as set forth herein at Counts One and Count Three, causing injury to Plaintiff.

82.    A.R.S. § 11-441(5) provides that Sheriff Arpaio shall "[t]ake charge of and keep county jail, including a county jail under the jurisdiction of a county jail district, and the prisoners in the county jail."

83.    Sheriff owed Plaintiff, as a pretrial inmate in the 4th Avenue Jail a duty to protect Plaintiff from the tortous injury caused by Holsom.

84.    Sheriff Arpaio and all Detention Officer's at his jails, including Holsom owed Plaintiff a constitutional duty as a pretrial detainee to protect Plaintiff's personal security.

85.   The manner in which Sheriff Arpaio disciplines and supervises Detention officers created a "code of silence" in which detention officers would not report misconduct of fellow detention officers and would do so with impunity.

86.   Sheriff Arpaio created a policy, practice and/or procedure that allowed Detention Officers to move and assign an inmate to a housing unit on their own authority without having to first obtain authorization from supervisors which resulted in Plaintiff being housed with known Mexican Mafia Members contrary to the "keep away" and Plaintiff's protective custody status.

87.   The breach of duty is shown and established by the following.

88.   Holsom threatened Plaintiff in a blatant and public way.

89.   Holsom made threats to physically harm Plaintiff in the immediate presence of other Detention Officers and did so without any consequence from other Detention Officers or supervisors at the jail.

90.   Even though Holsom's fellow officers witnessed the conduct, they failed to report what Holsom did to any supervisors and failed to take appropriate action to stop or prohibit such conduct.

91.   Holsom made the threats as though he was immune from any discipline or consequence.

92.   Not one Detention Officer who witnessed the following events reported what took place to his supervisor or in any way took action to stop Detention Officer Holsom from setting Plaintiff up for a beating from other inmates.

93.   The catalyst for bringing Holsom's conduct to light was after Plaintiff filed a grievance and reported the matter to Jail Intel, MCSO criminal investigators interviewed Holsom and the other present Detention Officers.

94.   An employer who is negligent or reckless in how it selects or otherwise deals with an employee is subject to direct liability to third parties for harm caused

by the employee's tortuous conduct.

95.    Sheriff Arpaio owed Plaintiff, as a pretrial detainee in his jail a duty of reasonable care to protect Plaintiff's personal security and that of his family while Plaintiff was in the jail.

96.    Sheriff Arpaio breached this duty by allowing and creating a "code of silence" among Detention Officers in the jail that enabled Holsom to blatantly and openly disclose Plaintiff as a "snitch" to inmates and especially Mexican Mafia members, moved Plaintiff into a cell block with Mexican Mafia members in violation of the "keep away" order when it was known by the guards that the Mexican Mafia had directed its members in the jail to get to and kill Plaintiff, obtain Plaintiff's personal information and that of his family and disclose that information to Mexican Mafia members and threaten Plaintiff with assault from Mexican Mafia members and then meticulously planned such an assault to actually take place.

97.    Holsom at all times was subject to the supervision and control by Sheriff Arpaio before, during and after he committed the tortuous acts against Plaintiff.

98.    As a Detention Officer, Holsom's every movement and action was under the supervision and control of his employer and scrutiny of his fellow Detention Officers so long as he was inside the jail.

99.    Holsom was working with other Detention Officers serving food who witnessed what he did.

100.    Holsom was supervised in the Tower by Tower Officer Knight when he made threats to kill Plaintiff and he arranged to carry it out.

101.    Holsom's actions were on his employer's video and audio recordings and he used his employer's facilities and his role at the jail to make and carry out these threats.

102.  The actions of Defendant Holsom and the inaction of the witnessing Detention Officers and their complete failure to report Holsom's misconduct, including Tower Control Officer Knight as set forth above,  establish that Sheriff Arpaio allowed and encouraged by his conduct the existence of the "code of silence."

103.  Sheriff Arpaio created a culture at the jails where he did not require reporting of guard's misconduct at the jails towards inmates by other detention officers or supervisors who witnessed the misconduct.

104.   As a result the Sheriff created a culture where Detention Officers and Supervisors felt they would not be held accountable for misconduct causing injury to inmates, especially for not reporting misconduct by other guards at the jail that they witnessed.

105.  The failure of witnessing Detention Officers to stop and report Holsom for his tortuous conduct is the direct result of the culture created by Sheriff Arpaio as a result of his supervision and control over his employees at the jail.

106.  The congregation of Mexican Mafia members or affiliates in one cell block was a direct result of Sheriff Arpaio's supervision and control of the Detention Officers at the Jail.

107.  The placement of Plaintiff in that cell block when he was supposed to be kept away from the Mexican Mafia because of threats on his life was the direct result of Sheriff Arpaio's supervision and control at the Jail.

108.  The failure to control the Mexican Mafia's influence over Detention Officers in the jail, including but not limited to Holsom, was a direct result of Sheriff Arpaio's supervision and control of the Jail.

109.  Nothing Holsom did could have been done without the knowledge of or acquiescence of those working with him or supervising him at the time at the jail.

110.  It is clearly foreseeable to Sheriff Arpaio that Detention Officers could be improperly influenced at the Jail to act for gangs such as the Mexican Mafia or other inmates and that Sheriff Arpaio needed to exercise appropriate polices, practices and procedures to prevent, find, and stop such conduct.

111.  Most importantly, Sheriff Arpaio needed to set a clear policy that Detention Officers are to report immediately any inappropriate conduct they witness by other guards taking place in the cell blocks.

112.  Had the Sheriff been careful in the hiring, training and/or supervision of Defendant Holsom and other Detention Officers at the Jail, Holsom would not have been able to put Lechuga in a pod where he could expose Plaintiff as an informant for MCSO and would not have exposed Plaintiff as a "snitch," or threatened Lechuga's life and his family.

113.  Sheriff Arpaio was negligent or reckless in the supervision of his employees at the jail, including Holsom and the Detention Offices who witnessed his misconduct towards Plaintiff.

114.  Sheriff Arpaio was negligent or reckless in failing to prevent tortuous conduct by his guard's at the jail toward inmates in the jail, including Plaintiff.

115.  The Sheriff's negligent hiring, retention and/or supervision of Defendant Holsom and the other Detention Officers and supervisors at the 4th Avenue Jail proximately caused Plaintiff injury as set forth above in the factual statement and in Counts One and Three, in an amount to be proven at trial.

116.  As a direct result of Sheriff Arpaio's negligent hiring, retention and supervision of Holsom and other Detention Officers and supervisors at the 4th Avenue Jail, Holsom caused Plaintiff severe emotional distress and caused him to fear for his life and for the life of his family.

**COUNT THREE**
**ASSAULT**

117.  The allegations set forth above are fully incorporated herein by this reference.

118.  Upon information and belief, Defendant Holsom intentionally caused Plaintiff to fear (apprehension of) an immediate harmful or offensive contact.

119.  Defendant Holsom's actions actually and proximately caused damage to Plaintiff in an amount to be proven at trial.

120.   Plaintiff is entitled to punitive damages against Defendant Holsom pursuant to A.R.S. § 12-820.4 to the extent they acted outside their course and scope of their employment.

121.  Defendant Maricopa County and/or Sheriff Arpaio is (are) respondeat superior liable for the actions of Defendant Holsom.

**COUNT FOUR**
**FOURTEENTH AMENDMENT**
**(42 U.S.C. § 1983)**

122.  The allegations set forth above are fully incorporated herein by this reference.

123.  This claim is against Defendant Holsom.

124.  The Fourteenth Amendment to the United States Constitution protects pretrial inmates from the infliction of harm by detention officers without due process of law.

125.  A pretrial inmate's Fourteenth Amendment rights are violated if there are circumstances indicating an evil intent, or recklessness or deliberate indifference to the consequences of conduct on those under the persons control or dependent upon him.

126.  Jail officials have a Fourteenth Amendment duty to protect the personal

14

1   security of inmates.

2   127.  Jail Officials violate a pretrial detainee's Fourteenth amendment rights if
3   they are deliberately indifferent to the detainee's personal security.

4   128.  A jail guard's deliberate indifference to the consequences of his conduct
5   for those under his control and dependent upon him may support a claim for
6   violation of the pretrial inmates Fourteenth Amendment rights under 42 U.S.C. §
7   1983.

8   129.  Under the Fourteenth Amendment, a pretrial detainee cannot be punished
9   at all, especially not by detention officers or guards.

10  130.  Upon information and belief, at all times relevant to the complaint,
11  Plaintiff was a pretrial detainee at the 4th Avenue Jail.

12  131.  Plaintiff was incarcerated under conditions that posed a substantial risk of
13  serious harm to him.

14  132.  Because of the existing threat to Plaintiff's life by Mexican Mafia
15  members, Plaintiff's life was seriously endangered when he was placed in a cell
16  block with significant number of Mexican Mafia members.

17  133.  Plaintiff was not supposed to be in cell block with a population of
18  Mexican Mafia members.

19  134.  Plaintiff was housed in conditions that posed a substantial risk of serious
20  harm to him each day he was housed in that cell block.

21  135.  Holsom knew this from his review of Plaintiff's files at the jail.

22  136.  Holsom's conduct as set forth above, exposed Plaintiff to actual assaults
    from other inmates and Holsom actually scheduled just such an assault.

23  137.  Holsom exposed Plaintiff as a snitch to Mexican Mafia members in the
24  cell block which put Plaintiff's life at risk.

25  138.  Holsom obtained and gave Plaintiff's family information to the Mexican
26

Mafia which exposed them to the risk of serious bodily harm or death.

139.  The Mexican Mafia has a history of killing snitches in jail and killing family members as well.

140.  The Mexican Mafia in the cell block let Plaintiff know they could get to his family by sliding his mother's address on a piece of paper under his cell door.

141.  Holsom was deliberately indifferent to the consequences of his conduct to Plaintiff who was under his control and dependent upon him for security and safety.

142.  The above acts by Holsom were intentionally done and Holsom knew his conduct was exposing Plaintiff and his family to a serious risk of harm.

143.  Holsom did not take any measures to abate the risk of harm to Plaintiff and his family from his conduct.

144.  In committing the above referenced actions and/or omissions, Defendant Holsom acted under color of state law, and engaged in conduct that was the proximate cause of a violation of  Plaintiff's rights under the Fourteenth Amendment to the Constitution of the United States of America, including but not limited to being deliberately indifferent to Plaintiff's safety and personal security and being deliberately indifferent to the consequences of his actions on Plaintiff and his family, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

145.  Defendant Holsom proximately caused Plaintiff damages in an amount to be proven at trial.

146.  Defendant Holsom's conduct caused Plaintiff sever emotion distress and fear for his life and the life of his family, especially when his cell door was opened after Holsom told him he was going to "fuck him up," told other inmates so Plaintiff could hear he was going to open Plaintiff's and their cell doors so that they could get to Plaintiff and then he opened Plaintiff's cell door so that this could take place.

147.  The threat to Plaintiff and his family continues even though Plaintiff was released from jail and continues to this day.

148.  Plaintiff is living his life looking over his back at all times because of Defendant Holsom's actions.

149.  Pursuant to 42 U.S.C. § 1983, Defendant Holsom is liable to Plaintiff for the above described violations of Plaintiffs Constitutional rights.

150.  Plaintiff is entitled to all rights, remedies, in law or in equity, available to him under 42 U.S.C. § 1983.

151.  Plaintiff is entitled to recover his reasonable costs and attorney's fees under 42 U.S.C. § 1988.

152.  Plaintiff is entitled to punitive damages.

**COUNT FIVE**
**RETALIATION**
**(42 U.S.C. § 1983)**

153.  The allegations set forth above are fully incorporated herein by this reference.

154.  Defendant Holsom, as a state actor (detention officer) took adverse action against Plaintiff (an inmate).

155.  Holsom did this through his threats to kill Plaintiff, exposing him as a "snitch" to inmates for MCSO, setting up an assault on Plaintiff by inmates and providing Plaintiff's family information to members of the Mexican Mafia who already had issued an order for its members to kill Plaintiff if they came into contact with him.

156.  Holsom took adverse action against Plaintiff's because Plaintiff was an agent (confidential informant) for Jail Intel and was providing information to Jail Intel regarding misconduct of detention officers who were providing drugs or other contraband inside the jail and Holsom was a Detention Officer working with the Mexican Mafia in the jail.

157.  Plaintiff's role as a confidential informant for Jail Intel is protected conduct. See *Howell v. Town of Ball,* 90 F. Supp. 3d 629, 634 (W.D. Louis. 2015) (a confidential informant for law enforcement is protected activity).

158.  Holsom's action as set forth in the factual statement and above impaired Plaintiff's ability to perform as an agent for Jail Intel and was designed to stop (chill) any further involvement by Plaintiff as an agent for Jail Intel.

159.  Because of the threat to Plaintiff's safety, a plea agreement was worked out with his prosecutor and as a result, Plaintiff was immediately released from jail on probation.

160.  Holsom's conduct was designed to expose Plaintiff and stop him from acting any further as a confidential informant.

161.  Holsom's conduct did not reasonably advance any legitimate correctional goal.

162.  In committing the above referenced actions and/or omissions, Defendant Holsom acted under color of state law, and engaged in conduct that was the proximate cause of a violation of Plaintiff's rights under the First Amendment to the Constitution of the United States of America, including but not limited to retaliation against Plaintiff for acting as an informant for Jail Intel and to stop him from continuing to do so, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

163.  Defendant Holsom Defendant proximately caused Plaintiff damages in an amount to be proven at trial.

164.  Defendant Holsom's conduct caused Plaintiff sever emotion distress and fear for his life and the life of his family, especially when his cell door was opened after Holsom told him he was going to "fuck him up," told other inmates so Plaintiff could hear he was going to open Plaintiff's and their cell doors so that they

could get to Plaintiff and then he opened Plaintiff's cell door so that this could take place.

165.   The threat to Plaintiff and his family continues even though Plaintiff was released from jail and continues to this day.

166.   Plaintiff is living his life looking over his back at all times.

167.   Pursuant to 42 U.S.C. § 1983, Defendant Holsom is liable to Plaintiff for the above described violations of Plaintiffs Constitutional rights.

168.   Plaintiff is entitled to all rights, remedies, in law or in equity, available to him under 42 U.S.C. § 1983.

169.   Plaintiff is entitled to recover his reasonable costs and attorney's fees under 42 U.S.C. § 1988.

170.   Plaintiff is entitled to punitive damages.

## COUNT SIX
## MONELL CLAIM
## (42 U.S.C. § 1983)

171.   The allegations set forth above are fully incorporated herein by this reference.

172.   This claim is brought against Sheriff Arpaio as the chief executive officer of MCSO.

173.   Jail officials have a constitutional duty to protect the personal security of inmates.

174.   "The right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause," and this right is not extinguished by lawful confinement." *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (citing *Ingraham v. Wright,* 437 U.S. 651, 673 (1977)).

175.   Sheriff Arpaio created, through his supervision and/or lack thereof a "code of silence" culture among the guards at the jail with respect to reporting

misconduct by other guards.

176.  The Code of Silence is shown by the failure of any of the Detention Officers who witnessed Detention Officer Holsom's conduct, especially Tower Officer Knight to report what they witnessed to supervisors and to only come forward when they were interviewed by Detectives after Plaintiff grieved what was done indicates the existence of a well established practice of silence (guards not reporting on each other).

177.  Upon information and belief no action was taken against any of the Detention Officers by Sheriff Arpaio for not coming forward and reporting Hoslom's misconduct.

178.  Further, the fact Detention Officers can move inmates to different cell blocks in the jail on their own authority and without permission and that as a result, Holsom moved Plaintiff into a cell block "highly populated with Mexican Mafia associates" when under prison directives Plaintiff was not to be housed near Mexican Mafia members or associates because of the known threat on Plaintiff life by Mexican Mafia members, indicates a practice and custom of Sheriff Arpaio not supervising and monitor the inner workings of the Jail and failing to hold Detention Officers and/or Supervisors accountable for misconduct that exposed inmates to a serious risk of harm.

179.  Holsom's acts threatening Plaintiff's personal security and safety in the jail were done in the open and in front of many other Detention Officers who did not report it.

180.  None of the Detention Officers who witnessed Holsom's conduct reported Holsom for his conduct until they were later interviewed by criminal investigators.

181.  In this case, Mexican Mafia members were being moved into the same cell block by Detention Officers and Plaintiff, who was not to be near Mexican

Mafia members was moved into that same cell block by Holsom.

182.   Based on the facts set forth above, and as are set forth in the Criminal Complaint (Probable Cause statement filed under oath by Holsom's arresting Officer), Sheriff Arpaio, acting under color of state law, implemented a policy, practice, procedure and/or custom that created a code of silence among Detention Officers and which allowed Plaintiff to be moved into a cell block with Mexican Mafia members in violation of Plaintiff's Constitutional rights under the Fourteenth Amendment, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

183.   The above described promulgated and implemented policy, practice, procedure and/or custom is so deficient that the "Code of Silence" itself and the authority to move inmates by Detention Officers is a repudiation of the above constitutional rights and is the moving force for the constitutional violation.

184.   The "Code of Silence" allowed Holsom and any other detention officers to threaten assault or injure inmates in violation of the above constitutional rights with impunity.

185.   Holsom violated Plaintiff's Constitutional rights openly and without his conduct being reported to supervisors.

186.   Upon information and belief Holsom acted because he knew the other Detention Officers would not report him.

187.   Holsom moved Plaintiff into a cell block with known Mexican Mafia members because he was authorized to move Plaintiff without supervision and he knew he could do so with impunity from his supervisors and fellow Detention Officers.

188.   Sheriff Arpaio proximately caused Plaintiff damages in an amount to be proven at trial.

189.   As a direct result of Sheriff Arpaio's policies, practices, procedures and

customs at the Jail, Defendant Holsom caused Plaintiff sever emotion distress and fear for his life and the life of his family, especially when his cell door was opened after Holsom told him he was going to "fuck him up," told other inmates so Plaintiff could hear he was going to open Plaintiff's and their cell doors so that they could get to Plaintiff and then he opened Plaintiff's cell door so that this could take place.

190.   The threat to Plaintiff and his family continues even though Plaintiff was released from jail and continues to this day.

191.   Plaintiff is living his life looking over his back at all times.

192.   Pursuant to 42 U.S.C. § 1983, Sheriff Arpaio is liable to Plaintiff for the above described violations of Plaintiffs Constitutional rights.

193.   Plaintiff is entitled to all rights, remedies, in law or in equity, available to him under 42 U.S.C. § 1983.

194.   Plaintiff is entitled to recover his reasonable costs and attorney's fees under 42 U.S.C. § 1988.

195.   Plaintiff is entitled to punitive damages.

   **WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

   1.   For compensatory damages, including but not limited to emotional distress, all in an amount to be determined at the time of trial;

   2.   For Attorneys fees and costs;

   3.   Award Plaintiffs punitive damages in an amount to be determined at the time of trial;

   4.   And to grant such other and further relief as the Court feels is just under the circumstances.

1
2
3          DATED this 25th day of November 2016.

4                                    KEITH M. KNOWLTON, LLC

5                                         /s/ Keith Knowlton
6                                    By _____
7                                       Keith Knowlton, Esq.
                                        Attorney for Plaintiff
8                          CERTIFICATE OF SERVICE

9          I hereby certify that on November 25, 2016, I electronically transmitted the

10    attached Second Amended Complaint to the Clerk's Office using the ECF System

11    for filing and transmittal of a Notice of Electronic Filing to the following ECF

12    registrants:

13    Charles E. Trullinger
      MARICOPA COUNTY ATTORNEY'S OFFICE
14    CIVIL SERVICES DIVISION
15    222 North Central Ave., Suite 1100
      Phoenix, Arizona 85004
16    Attorney for Maricopa County Defendants
17
      Ian Neale
18    BURCH & CRACCHIOLO, P.A.
19    702 E. Osborn Road, Suite 200
      Phoenix, Arizona 85014
20    Attorney for Defendant Holsom
21
22          /s/ Keith Knowlton
23    By: _____
24
25
26

                                        23